228 F.3d 1043 (9th Cir. 2000)
 NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF PSYCHOANALYSIS, a Delaware corporation; CEDRUS MONTE; ALLAN D. SOWERS; LIONEL CORBETT, Plaintiffs-Appellants,
v.
CALIFORNIA BOARD OF PSYCHOLOGY, a state board (Board); BILL LOCKYER, California State Attorney General; STATE OF CALIFORNIA; THOMAS O'CONNOR, the Board's executive officer
in his official capacity only; BRUCE EBERT; JUDITH JANARO FABIAN; LILLI FRIEDLAND; MARTIN GREENBERG; LINDA HEE; MARY MCMILLAN; MARILYN PALAREA; MARY ELLEN EARLY; EMIL RODOLFA, PhD, Defendants-Appellees.
 No. 99-15243
 United States Court of Appeals for the Ninth Circuit
 Argued and Submitted April 13, 2000
Filed September 29, 2000
 
 [Copyrighted Material Omitted]
 Jeffrey S. Love, Lane Powell Spears Lubersky LLP, Portland, Oregon, for the plaintiffs-appellants.
 Kerry Weisel, Deputy Attorney General, Oakland, California, for the defendants-appellees.
 Appeal from the United States District Court for the Northern District of California; William H. Orrick, District Judge, Presiding. D.C. No. CV 97-3913 WHO.
 Before: A. Wallace Tashima and Susan P. Graber, Circuit Judges, and Robert J. Kelleher,* Senior district Judge.
 TASHIMA, Circuit Judge:
 
 
 1
 Plaintiff psychoanalysts Lionel Corbett, Cedrus Monte, and Allan Sowers, and the National Association for the Advancement of Psychoanalysis ("NAAP") (collectively "plaintiffs") sued defendants, members of the California Board of Psychology ("Board"), and the Attorney General of California, for declaratory and injunctive relief under 42 U.S.C. 1983. Plaintiffs allege that California's mental health licensing laws, which regulate the practice of psychology and other professions, restrict their First and Fourteenth Amendment rights. Specifically, they assert that the licensing scheme prohibits them from practicing psychoanalysis in California. The district court held that plaintiffs failed to state a claim under Federal Rule of Civil Procedure 12(b)(6), and dismissed their complaint and the action. We affirm.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 A. Psychoanalysis and Psychology
 
 2
 Psychoanalysis and Psychology "Psychoanalysis" is defined in Stedman's Medical Dictionary (25th ed. 1990) as:
 
 
 3
 [A] method of psychotherapy, originated by Freud, designed to bring preconscious and unconscious material to consciousness primarily though the analysis of transference and resistance. . . . A method of investigating the human mind and psychological functioning, especially through free association and dream analysis in the psychoanalytic situation.
 
 
 4
 Id. at 1284; see also American Medical Association Encyclopedia of Medicine 831 (1989) ("The psychoanalyst is usually a doctor of medicine.").[1]
 
 
 5
 "Psychology" has been defined as:
 
 
 6
 The scientific study of mental processes. Psychology deals with all internal aspects of the mind, such as memory, feelings, thought, and perception, as well as external manifestations, such as speech and behavior. It also addresses intelligence, learning and the development of personality. Methods employed in psychology include direct experiments, observations, surveys, study of personal histories, and special tests (such as intelligence tests and personality tests).
 
 
 7
 Id. at 832 (emphasis omitted). Psychology includes various approaches, including "psychoanalytic psychology, " which "stresses the role of the unconscious and childhood experiences." Id.
 
 B. Licensing Scheme
 
 8
 The profession of psychology has been regulated in California since 1958, when the Legislature enacted the Psychology Certification Act, Cal. Bus. & Prof. Code ' 2900-2980 (1958), which "served only to protect the title `psychologist,' " but did not define the practice of psychology. Executive Summary, California Board of Psychology, Sunset Review Report , at 1 (October 1, 1997) ("Sunset Report"). In 1967, the Legislature "recognized the actual and potential consumer harm that can result from the unlicensed, unqualified or incompetent practice of psychology" and enacted the Psychology Licensing Law, Cal. Bus. & Prof. Code ' 2900 2996.6 (1968). Sunset Report at 1. That law includes a legislative finding that the "practice of psychology in California affects the public health, safety, and welfare and is to be subject to regulation and control in the public interest to protect the public from the unauthorized and unqualified practice of psychology." Cal. Bus. & Prof. Code 2900.
 
 
 9
 The California Business and Professions Code defines a "psychologist" as a person so representing himself or herself "to the public by any title or description," including "psychoanalysis" and "psychoanalyst." Cal. Bus. & Prof. Code 2902(c). The practice of psychology in California requires a license and is defined as rendering any psychological ser vice to the public "for a fee." Id. 2903 (stating that "[n]o person may engage in the practice of psychology, or represent himself to be a psychologist, without a license" unless other wise specified by statute).
 
 
 10
 To qualify for a license to practice psychology in California, an applicant must possess a doctorate, or a degree deemed 12505 equivalent, in psychology or a related field such as education psychology. See id. 2914(b). An applicant must have at least two years of supervised professional experience under the direction of a licensed psychologist. See id. 2914 (c). In addition, an applicant must pass the Board's examination, complete training in substance dependency, and fulfill course work requirements in partner abuse and human sexuality. See id. 2914 (d)-(f). Any violation of the laws regulating psychologists can be punished as a misdemeanor.
 
 
 11
 Section 2529 of the Business and Professions Code, relating to research psychoanalysts, is the only part of the statute that specifically addresses the qualifications of psychoanalysts. Under 2529, graduates of four, specific, California psychoanalytic institutes, or institutes deemed equivalent, "may engage in psychoanalysis as an adjunct to teaching, training, or research and hold themselves out to the public as psychoanalysts . . . ." Id. 2529. Under the regulations, a research psychoanalyst may render psychoanalytic services for a fee for only a third (or less) of his or her professional time. See Cal. Code Regs. ("C.C.R."), tit. 16 1371. If they register with the state, students and graduates also "may engage in psychoanalysis under supervision, provided " that they do not imply in any way that they are licensed to practice psychology. Cal. Bus. & Prof. Code 2529."Physicians and surgeons, psychologists, clinical social workers, and marriage, family and child counselors, licensed in this state " need not register to engage in research psychoanalysis. See 16 C.C.R. 1369.
 
 
 12
 The licensing laws do not prevent "qualified members of other recognized professional groups," including physicians, clinical social workers, family and child counselors, attorneys and ordained members of recognized clergy, from doing work of a psychological nature consistent with the laws governing their respective professions, provided that they do not hold themselves out to the public as psychologists or use terms that 12506 imply they are licensed to practice psychology. Cal. Bus. & Prof. Code 2908.
 
 C. Plaintiffs
 
 13
 The NAAP is a membership association of professional psychoanalysts dedicated to encouraging the study of, and improving the practice of, psychoanalysis in the United States and other countries. Its membership includes more than 1,000 certified psychoanalysts and more than 400 psychoanalyst candidates-in-training. The NAAP alleges that it has lost income from membership dues as a result of California's licensing scheme. According to the complaint, the NAAP filed suit "on its own behalf, as a representative of its members whose practice of psychoanalysis in California allegedly has been unreasonably restricted by California law, and on behalf of California residents who are prevented from retaining those NAAP members for professional psychoanalysis."
 
 
 14
 Plaintiff Corbett is a physician licensed to practice in three states and England, but not in California, because he lacks a one-year medical residency in the United States or Canada. He has been certified as a Diplomate Jungian Analyst by the C.G. Jung Institute of Chicago, which does not award a doctorate degree.[2] Dr. Corbett is currently a professor at the Pacifica Graduate Institute in Santa Barbara, California, where he trains psychology Ph.D. candidates in the theory and practice of psychoanalytic psychotherapy. He has held academic appointments in departments of psychiatry at four United States medical schools.
 
 
 15
 Plaintiff Monte, who lives in California, has a master's degree in psychology from California State University at Sonoma and a diploma in analytical psychology from the C.G. Jung Institute in Zurich, Switzerland. Monte undertook clinical training in psychoanalysis in Switzerland, where she paid her supervisors and saw clients at a different site from her supervisors. Monte has been ordained as a Diplomate Jungian Analyst by the Association for the Integration of the Whole Person, a religious organization chartered in California. Monte would be eligible for a psychology license in California only if she completed additional courses and acquired supervised professional experience.
 
 
 16
 Plaintiff Sowers holds a master's degree in divinity and a certificate in psychoanalysis from the National Psychological Association for Psychoanalysis in New York City. Sowers is certified as a pastoral counselor in the Presbyterian Church and certified as a psychoanalyst in the State of Vermont. He is a resident of New York, but intends to travel to California to establish a psychoanalytic practice. He wishes to hold him self out professionally to the public, using the title "psychoanalyst."
 
 D. Procedural History
 
 17
 The district court dismissed plaintiffs' first amended com plaint under Federal Rule of Civil Procedure 12(b)(1) because no plaintiff had properly alleged standing. Also, based on Eleventh Amendment immunity, the court dismissed with prejudice two defendants, the State of California and the Board. Plaintiffs were granted further leave to amend "to allege further facts" demonstrating standing. The district court thereafter dismissed the second amended complaint, ruling that plaintiffs lacked standing because the complaint was "conclusory" on standing issues. Plaintiffs, however, were granted leave to amend "one more time."
 
 
 18
 Plaintiffs then filed their third amended and supplemental complaint ("complaint"), which was dismissed with prejudice for failure to state a claim. The district court concluded that, although standing was adequately alleged, the complaint 12508 failed to state claims under the First or Fourteenth Amendment. Plaintiffs filed a timely notice of appeal.
 
 II. JURISDICTION
 
 19
 The district court had jurisdiction pursuant to 28 U.S.C. 1331. We have jurisdiction pursuant to 28 U.S.C. 1291.
 
 III. STANDARD OF REVIEW
 
 20
 We review de novo the district court's dismissal for failure to state a claim pursuant to Rule 12(b)(6). See Two Rivers v. Lewis , 174 F.3d 987, 991 (9th Cir. 1999). We must "accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." Id. "Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." Halkin v. VeriFone, Inc. (In re VeriFone Sec. Litig. ), 11 F.3d 865, 868 (9th Cir. 1993). In determining whether plaintiffs can prove facts in support of their claim that would entitle them to relief, we may consider facts contained in documents attached to the complaint. See Roth v. Garcia Marquez , 942 F.2d 617, 625 n.1 (9th Cir. 1991) (citing Durning v. First Boston Corp., 815 F.2d 1265, 1267 (9th Cir. 1987)).
 
 IV. DISCUSSION
 
 21
 Plaintiffs allege that California's mental health licensing laws abridge their Fourteenth Amendment substantive due process and equal protection rights and their First Amendment rights of speech and association.[3] We affirm the district court's dismissal because we hold that plaintiffs have failed to state any claim for constitutional relief.[4]
 
 A. Fourteenth Amendment
 
 22
 To withstand Fourteenth Amendment scrutiny, a statute is required to bear only a rational relationship to a legitimate state interest, unless it makes a suspect classification or implicates a fundamental right. See City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976) (per curiam) (equal protection); Richardson v. City & County of Honolulu, 124 F.3d 1150, 1162 (9th Cir. 1997), cert. denied, 119 S. Ct. 168 (1998) (substantive due process).
 
 1. Fundamental Right
 
 23
 Because psychoanalysts are not a suspect class entitled to heightened scrutiny, we must examine whether the licensing scheme implicates any fundamental right. We hold that it does not.
 
 
 24
 Plaintiffs contend that California's mental health licensing laws are subject to strict scrutiny under the Due Process Clause of the Fourteenth Amendment because they implicate the fundamental rights associated with the close-knit relation ships between analysts and analysands. It is true that the Fourteenth Amendment protects some personal relationships, such as "those that attend the creation and sustenance of a family" and other "highly personal relationships." IDK, Inc. v. Clark County , 836 F.2d 1185, 1193 (9th Cir. 1988) (internal quotation marks and citation omitted).
 
 
 25
 At the other end of the relationship spectrum, we have held that the relationship between an escort and a client paying for escort services is not an intimate association implicating substantive due process rights. See id. Although we do not imply that the relationship between a client and an escort is similar in nature to the relationship between a patient and a psychoanalyst, we do find some of our analysis in IDK to be instructive. The relationship between a client and a psychoanalyst lasts "only as long as the client is willing to pay the fee." Id. Even if analysts and clients meet regularly and clients reveal secrets and emotional thoughts to their analysts, these relationships simply do not rise to the level of a fundamental right. See Zablocki v. Redhail, 434 U.S. 374, 383-86 (1978) (right to marry); Moore v. City of East Cleveland, 431 U.S. 494, 503-06 (1977) (right to live with family); Griswold v. Connecticut , 381 U.S. 479, 482-86 (1965) (right to marital privacy); Pierce v. Society of Sisters, 268 U.S. 510, 534-35 (1925) (right of parents to direct children's upbringing and education). "These are not the ties that `have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs.' " IDK, 836 F.2d at 1193 (quoting Roberts v. United States Jaycees, 468 U.S. 609, 618-19 (1984)).
 
 
 26
 We further conclude that substantive due process rights do not extend to the choice of type of treatment or of a particular health care provider. The Seventh Circuit has noted that 12511 "most federal courts have held that a patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider." Mitchell v. Clayton, 995 F.2d 772, 775 (7th Cir. 1993) (citations omitted). We agree, and hold that there is no fundamental right to choose a mental health professional with specific training.
 
 2. Rational Basis
 
 27
 Because we conclude that the licensing scheme neither utilizes a suspect classification nor implicates a fundamental right, we now examine whether it is "rationally related to a legitimate state interest." Dukes, 427 U.S. at 303. In applying the rational basis test, we presume the constitutionality of the classification. See id. "[T]hose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reason ably be conceived to be true by the governmental decision maker." Vance v. Bradley, 440 U.S. 93, 111 (1979); see also Williamson v. Lee Optical, 348 U.S. 483, 488 (1955) (holding under a Fifth Amendment due process analysis that a statute should be upheld if "it might be thought that the particular legislative measure was a rational way to correct " a problem). "[W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did." Dittman v. California, 191 F.3d 1020, 1031 (9th Cir. 1999) (quoting Halverson v. Skagit County , 42 F.3d 1257, 1262 (9th Cir. 1995) (citation and internal quotation marks omitted)), cert. denied, 120 S. Ct. 2717 (2000). We need only determine whether the licensing scheme has a "conceivable basis" on which it might survive rational basis scrutiny. Id. (quoting Lupert v. California State Bar, 761 F.2d 1325, 1328 (9th Cir. 1985)).
 
 
 28
 Plaintiffs advance numerous arguments about why the licensing scheme should fail rational basis review. Primarily, 12512 they contend that: (a) there is no rational basis for requiring professionals who already are trained in psychoanalysis to obtain additional training in order to qualify for a license; (b) the licensing scheme irrationally exempts research psychoanalysts from its requirements; (c) the licensing scheme is irrational because it is unnecessary and ineffective; and (d) the licensing scheme is irrational because it is more stringent than similar schemes regulating other counseling professions. We do not find any of those arguments persuasive and conclude that the licensing scheme is rationally related to California's interest in protecting the mental health and safety of its citizens.
 
 
 29
 First, plaintiffs argue that there is no rational basis for requiring professionals already trained in psychoanalysis to have certain other training in order to obtain a license. Because the Lochner[5] era has long passed, this argument must fail. See Armendariz v. Penman, 75 F.3d 1311, 1318 (9th Cir. 1996) (stating that Lochner "symbolizes an era in which the Court, invalidating economic legislation, engaged in a level of judicial activism which was unprecedented in its time and unmatched since"). As the Supreme Court stated in Williamson:
 
 
 30
 It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.
 
 
 31
 The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.
 
 
 32
 348 U.S. at 488 (citation omitted).
 
 
 33
 This case is nearly identical to Maguire v. Thompson, 957 F.2d 374 (7th Cir. 1992), in which the Seventh Circuit held that the Illinois General Assembly had a rational basis for requiring certain training for health care professionals to obtain a medical license, even though naprapaths, who treat human ailments through manipulation of tissue, were excluded from practicing. The Maguire court observed that:
 
 
 34
 [T]he General Assembly could have concluded that [certain] level[s] of education provide[ ] better training in theories of disease. Logically, better training leads to better diagnosis and better treatment. . . . [I]t is within the legislative prerogative to limit the practice of medicine to those who provide the safest service.
 
 
 35
 . . . It would even be rational for a legislature to conclude that the training offered in a school of naprapathy would in fact be inadequate for proper medical diagnosis and treatment and therefore people seeking treatment from those who hold only a degree in naprapathy run a serious risk of either misdiagnosis or non-diagnosis of their ailment.
 
 
 36
 Id. at 377-78 (citation omitted). The Seventh Circuit again utilized the reasoning of Maguire in holding that the Illinois legislature could regulate acupuncture by requiring a degree from a chiropractic school. See Mitchell, 995 F.2d at 774-76. We agree with the reasoning of these cases.
 
 
 37
 Based on the health and welfare of its citizens, California certainly has a "conceivable rational basis " for regulating the licensing of psychologists, and therefore, psychoanalysts. Dittman, 191 F.3d at 1031. According to the Supreme Court, "health . . . includes psychological as well as physical well being." United States v. Vuitch, 402 U.S. 62, 72 (1971). The California Legislature first regulated psychology because it "recognized the actual and potential consumer harm that can result from the unlicensed, unqualified or incompetent practice of psychology." Sunset Report at 1. The Psychology Licensing Law includes a legislative finding that the "practice of psychology in California affects the public health, safety, and welfare and is to be subject to regulation and control in the public interest to protect the public from the unauthorized and unqualified practice of psychology." Cal. Bus. & Prof. Code 2900. Plaintiffs Monte and Corbett even concede in their declarations that psychoanalytic methods cannot effectively be used to treat people with major mental illness. According to Dr. Corbett, the adverse effects of incompetent psychotherapy could include sexual activity between a client and therapist, deteriorating mental health, family, job, and relationships of the patient, and even suicide. Regulating psychology, and through it psychoanalysis, is rational because it is within the state's police power to regulate mental health treatment. See Maguire, 957 F.2d at 377.
 
 
 38
 Next, plaintiffs assert that the licensing scheme is irrational because it exempts research psychoanalysts from its requirements. As the district court noted, the exemption for research psychoanalyst is valid because it is not unusual or irrational to provide exemptions in a licensure statute. See Cal. Bus. & Prof. Code 2529 (allowing the practice of psychoanalysis "as an adjunct to teaching, training or research"). The licensing scheme also contains exemptions for employees of schools and governmental agencies, psychologists licensed in other jurisdictions, and graduate students. See id. ' 2909 12. Certainly it is rational for the Legislature to allow academics to engage in psychoanalysis on a limited basis to enhance teaching and research. Further, it is not improper for the Legislature to single out research psychoanalysts. The Supreme Court has held that a state legislature addressing health and safety reform "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select 12515 one phase of one field and apply a remedy there, neglecting the others." Williamson, 348 U.S. at 489 (citations omitted). The California Legislature enacted a certification law regulating psychology in the 1950s, substituted a licensing scheme in the 1960s, and enacted a limited exception for academic research psychoanalysis in the 1970s.
 
 
 39
 Plaintiffs argue additionally that the licensing scheme is not rationally related to a legitimate state interest because it is ineffective and unnecessary. In support of their argument, they observe that a committee had recommended to the California Medical Board that the laws regulating psychoanalysts were unnecessary and ineffective. As additional evidence that the scheme is unnecessary, plaintiffs point to the facts that research psychoanalysts are allowed to practice without meeting all of the requirements of the licensing scheme and that, in four years, only one complaint has been filed against a research psychoanalyst. Research psychoanalysts, however, are a small and discrete group. That they appear to be able to practice satisfactorily without having met all licensing requirements does not compel the Legislature to infer that all psychoanalysts could practice satisfactorily without having met the educational and experience requirements of the licensing scheme. We thus perceive no legal basis for interfering with the Legislature's judgment regarding the training needed for mental health professionals.
 
 
 40
 Plaintiffs next argue that the psychology licensing laws have no rational basis because the California licensing schemes for other, similar counseling professions are less stringent. Plaintiffs highlight the differences between the licensing schemes for family counselors and social workers, as opposed to psychologists, in an attempt to show that the exclusion of psychoanalysts is irrational, when other professionals are permitted to engage in counseling. See Cal. Bus. & Prof. Code ' 4996, 4996.12, 4980, 4980.02. To qualify for a license, a social worker must have a master's degree from an accredited school of social work, two years of supervised 12516 experience, and chemical dependency training. See id. 4996.2. For licensure, a marriage, family, and child counselor must have a master's or doctorate degree from an accredited school, certain course work, a supervised clinical placement, and two years of supervised experience. See id. 4980.40. The stated purpose of the marriage and family therapy law is to regulate the provision of "wise, competent, caring, compassionate, and effective counseling in order to enable [people] to improve and maintain healthy family relationships. Healthy individuals and healthy families and healthy relationships are inherently beneficial and crucial to a healthy society, and are our most precious and valuable natural resource." See id. 4980(a). The question is not whether we would choose to implement the same scheme, but whether it was rational for the California Legislature to implement different licensing schemes for psychologists, and for social workers and family counselors. It is not irrational for the Legislature to progress one step, or one profession, at a time. See Williamson , 348 U.S. at 489.
 
 
 41
 Finally, plaintiffs attack the psychologist licensing scheme on several other grounds, all of which we reject. They suggest that the scheme is irrational because other states, such as Vermont, Washington and Colorado, have less restrictive licensing schemes for psychoanalysts. This does not mean, however, that it is irrational for California to have its existing scheme. It simply is not the function of the courts to tell California how to craft its legislation.
 
 
 42
 Plaintiffs also argue that there is no rational basis for the Legislature to require two years of supervised on-site training and to credit only non-paid supervision for psychologists. See 16 C.C.R. 1387(r). Plaintiffs claim that psychoanalysts practice at sites separate from their supervisors' locations and sometimes pay for this supervision. See 16 C.C.R. 1387. Specifically, Dr. Corbett paid for her supervision in England. It is certainly rational, however, for the Legislature to require on-site supervision for the training of mental health professionals. See Maguire , 957 F.2d at 377 (holding that it is rational for a legislature to require certain levels of education for health care professionals). It is also rational to be suspicious of paid-for supervision.
 
 
 43
 We conclude that the psychologist licensing scheme is rationally related to legitimate government interests; there fore, the district court properly dismissed plaintiffs' Fourteenth Amendment claims.
 
 B. First Amendment
 
 44
 Plaintiffs further contend that California's psychologist licensing laws violate their First Amendment rights to freedom of speech.[6] The First Amendment applies to state laws and regulations through the Due Process Clause of the Fourteenth Amendment. See 44 Liquormart, Inc. v. Rhode Island , 517 U.S. 484, 489 n.1 (1996). We conclude that, even if a speech interest is implicated, California's licensing scheme passes First Amendment scrutiny.
 
 1. Extent to Which Speech is Implicated
 
 45
 The Supreme Court has held that "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 502 (1949); see also Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978) (holding that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity").
 
 
 46
 Plaintiffs contend that, because psychoanalysis is the "talking cure," it deserves special First Amendment protection because it is "pure speech." As the district court noted, how ever, "the key component of psychoanalysis is the treatment of emotional suffering and depression, not speech . . . . That psychoanalysts employ speech to treat their clients does not entitle them, or their profession, to special First Amendment protection."[7] The Supreme Court has noted that "[w]hile it is possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amend ment." City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989), quoted in Las Vegas Nightlife, Inc. v. Clark County , 38 F.3d 1100, 1102 (9th Cir. 1994). The communication that occurs during psychoanalysis is entitled to constitutional protection, but it is not immune from regulation. See IDK , 836 F.2d at 1191 (noting that simply because speech may be implicated, an activity is not "excluded from the safeguards of the first amendment").
 
 
 47
 The Supreme Court noted that an attorney's in-person solicitation of clients is "entitled to some constitutional protection," but "is subject to regulation in furtherance of important state interests." Ohralik, 436 U.S. at 459. The Ohralik Court also noted "numerous" examples of communications "that are regulated without offending the First Amendment." Id. at 456 (highlighting the exchange of securities information, corporate proxy statements, exchange of price and production information among competitors, and employers' threats of retaliation for the labor activities of employees). The Supreme Court held that the regulation of solicitation within the legal profession "falls within the State's proper sphere of economic and professional regulation." Id. at 459.
 
 
 48
 It is properly within the state's police power to regulate and license professions, especially when public health concerns are affected. See Watson v. Maryland , 218 U.S. 173, 176 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). Justice Jackson eloquently summarized the state's interest in licensing certain professions:
 
 
 49
 The modern state owes and attempts to perform a duty to protect the public from those who seek for one purpose or another to obtain its money. When one does so through the practice of a calling, the state may have an interest in shielding the public from the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency. A usual method of performing this function is through a licensing system.
 
 
 50
 Thomas v. Collins , 323 U.S. 516, 544 (1945) (Jackson, J., concurring). Given the health and safety implications, California's interest in regulating mental health is even more com pelling than a state's interest in regulating in-person solicitation by attorneys. We conclude that the licensing scheme is a valid exercise of California's police power.
 
 2. Content and Viewpoint Neutrality
 
 51
 We further conclude that California's licensing scheme is content and viewpoint neutral; therefore, it does not trigger strict scrutiny. We have held that " `[t]he appropriate 12520 level of scrutiny is tied to whether the statute distinguishes between prohibited and permitted speech on the basis of con tent.' " Black v. Arthur, 201 F.3d 1120, 1123 (9th Cir. 2000) (quoting Foti v. City of Menlo Park, 146 F.3d 629, 635 (9th Cir. 1998)). "The `principal inquiry' in determining whether a regulation is content-neutral or content-based`is whether the government has adopted [the] regulation . . . because of [agreement or] disagreement with the message it conveys.' " Crawford v. Lungren, 96 F.3d 380, 384 (9th Cir. 1996) (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641 (1994)).
 
 
 52
 California's mental health licensing laws are content neutral; they do not dictate what can be said between psychologists and patients during treatment. Nothing in the statutes prevents licensed therapists from utilizing psychoanalytical methods or prevents unlicensed people from engaging in psychoanalysis if no fee is charged.[8] This reasoning mirrors Justice Jackson's concurrence in Thomas, 323 U.S. at 545, in which he stated:
 
 
 53
 A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person making a speech about the rights of man or the rights of labor . . . . Likewise, the state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.
 
 
 54
 Id. (Jackson, J., concurring).
 
 
 55
 Although the California laws and regulations may require certain training, speech is not being suppressed based on its message. Plaintiffs argue that the licensing scheme regulates the content of speech because the Board's psychological examination tests only certain areas, including the biological bases of behavior, research methods, and assessment and diagnosis. Plaintiffs contend that psychoanalysts, on the other hand, are trained in such areas as Jungian under standing of personality, techniques for the activation and interpretation of the unconscious, and archetypal material, including mythology and fairy tales. Plaintiffs also allege that the Board uses the content of an institution's curriculum to determine which institutions provide "equivalent " training under California Business and Professions Code ' 2914 and 2529. The licensing scheme, however, was not adopted because of any disagreement with psychoanalytical theories. See Crawford , 96 F.3d at 384. It was adopted for the important purpose of protecting "public health, safety, and welfare." Cal. Bus. & Prof. Code 2900.
 
 
 56
 This case is different from Riley v. National Fed'n of the Blind , 487 U.S. 781 (1988). In Riley, the Supreme Court held that North Carolina's licensing laws for professional fund raisers violated the First Amendment because the state had "the power directly and substantially to affect the speech they utter." Id. at 801. California does not dictate the content of what is said in therapy; the state merely determines who is qualified as a mental health professional. Mental health professionals, unlike fundraisers, safeguard public health interests by monitoring the care and safety of their patients.[9]
 
 
 57
 Although some speech interest may be implicated, California's content-neutral mental health licensing scheme is a valid exercise of its police power to protect the health and safety of its citizens and does not offend the First Amendment.[10]
 
 3. Prior Restraint
 
 58
 In addition, we hold that the psychology licensing laws are not a prior restraint on speech. See Baby Tam & Co., Inc. v. City of Las Vegas, 154 F.3d 1097, 1100 (9th Cir. 1998) ("A prior restraint exists when the enjoyment of protected expression is contingent upon the approval of government officials."). Because this is a valid licensing scheme designed to protect the mental health of Californians, the state "may exercise some discretion in granting licenses." IDK, 836 F.2d at 1196. Because there is no allegation that the state is revoking or denying licenses "for arbitrary or constitutionally suspect reasons," there is no problem of prior restraint. Id.; see also City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 755-56 (1988) (fearing "unbridled discretion" in state officials could result in censorship); Young v. City of Simi Valley, 216 F.3d 807, 819 (9th Cir. 2000) ("When an approval process . . . is completely discretionary, there is a danger that protected speech will be suppressed impermissibly because of the government official's . . . distaste for the content of the speech.") (citation omitted).
 
 V. CONCLUSION
 
 59
 In sum, we hold that California's psychology licensing laws do not violate either the First or the Fourteenth Amendment. We thus affirm the district court's dismissal of this action. As the district court noted, plaintiffs' concerns about the licensing of psychoanalysts are "best addressed to the state legislature."
 
 
 60
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Robert J. Kelleher, Senior United States District Judge for the Central district of California, sitting by designation.
 
 
 [1]
 Plaintiffs allege that psychoanalysis:
 is a treatment based on verbal communication between the analyst and client. Its aim is to promote emotional growth through insight, character change, personal integration, and a lessening of symptoms that originate in the client's mind or emotions. It is based on extensive scientific research into human behavior and inner experience. The term psychoanalyst identifies practitioners from various schools of thought including Adlerian, Existential, Eclectic, Ego-Psychology, Freudian, Jungian, Modern Freudian, Object Relations, and Self-Psychology institutes.
 Plaintiffs further claim that "[t]he association between the analyst and the analysand is deep, intimate, personal and lengthy. The analysand typically sees the analyst two to five hours a week for two to five years or more. . . . Strong emotional bonds develop between the analysand and analyst, and are an expected part of the therapeutic process."
 
 
 [2]
 The research psychoanalyst laws do not recognize the psychoanalytic institute from which he graduated as substantially equivalent to California institutes.
 
 
 [3]
 Plaintiffs alleged right to travel and freedom of religion claims below, but on appeal made no arguments relating to them. Plaintiffs also do not challenge the Eleventh Amendment dismissal of the State and the Board. We deem all of these arguments waived. See Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir. 1999). There is some hint in plaintiffs' briefs of an overbreadth challenge; however, it is never explicitly argued, and thus is also waived. See Retlaw Broad. Co. v. NLRB, 53 F.3d 1002, 1005 n.1 (9th Cir. 1995) (holding that an issue is waived if the briefs fail to contain appellant's contentions, and citations to authorities, statutes, and the record).
 
 
 [4]
 We agree with the district court that there is no problem of standing for either the individual plaintiffs or the NAAP, as an organization. See Lujan v. Defenders of Wildlife , 504 U.S. 555, 560-61 (1992) (holding that to satisfy constitutional standing, plaintiffs must show that: (1) they suffered an "injury in fact;" (2) the injury is fairly traceable to the challenged action of defendants; and (3) it is "likely," as opposed to " speculative," that the injury will be redressed by a favorable decision) (citations and internal quotation marks omitted); Hunt v. Washington State Apple Adver. Comm'n , 432 U.S. 333, 343 (1977) (holding that an organization has standing to sue on behalf of its members where: (1) the individual members would otherwise have standing to sue on their own; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) the lawsuit does not require the participation of individual members).
 
 
 [5]
 Lochner v. New York, 198 U.S. 45 (1905).
 
 
 [6]
 Our discussion of highly personal relationships under Fourteenth Amendment substantive due process, see Part IV.A.1, supra , also disposes of plaintiffs' freedom of association claims under the First Amendment. See IDK , 836 F.2d at 1192-96.
 
 
 [7]
 This discussion relates as well to plaintiffs' claim that the First Amendment extends to the rights of clients to receive information from their psychoanalysts. See Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1027 n.5 (9th Cir. 1998) (acknowledging "the well-established rule that the right to receive information is an inherent corollary of the rights of free speech and press, because the right to distribute information necessarily protects the right to receive it . . . the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom") (internal quotation marks and citation omitted).
 
 
 [8]
 We agree with the district court that the statutory scheme does not pre vent plaintiffs from engaging in psychoanalysis if they do not charge a fee. Under the "psychologists" licensing law, the practice of psychology explicitly includes charging a fee. See Cal. Bus. & Prof. Code 2903. Under the "medicine" licensing law, however, a physician's or surgeon's certificate is needed for someone to treat any disease, including mental conditions, regardless of whether a fee is charged. See id. 2051. "Any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing, any system or mode of treating the sick or afflicted in this state . . . is guilty of a misdemeanor." Id. 2052. In 1941, however, then California Attorney General Earl Warren interpreted the "medicine" licensing law to prohibit the unlicensed practice of psychoanalysis regardless of whether any fee was charged. See Cal. Op. Atty. Gen. N835334 (May 22, 1941).
 Under the most logical reading of California's current statutory scheme, however, psychoanalysis is no longer included in the medical licensing scheme because it is explicitly referenced in the psychology licensing statute. "Psychoanalyst" is included as an inappropriate title for an unlicensed person under Cal. Bus. & Prof. Code 2902(c), which was amended as recently as 1989. The Legislature could have made clear that psychoanalysis was prohibited by the medical licensing laws, but it did not do so; instead, it explicitly referenced psychoanalysis in the psychology licensing laws. Cf. Russello v. United States, 464 U.S. 16, 23-24 (1983) ("[W]here Congress includes language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." ) (citation and internal quotation marks omitted).
 
 
 [9]
 This case is also different from Spiritual Psychic Science Church of Truth, Inc. v. City of Azusa, 703 P.2d 1119, 1123-29 (Cal. 1985), in which the California Supreme Court relied on federal case law to invalidate, under Article I, Section 2 of the California Constitution, a city ordinance that completely prohibited the practice of fortune telling and palm reading for a fee. Here, California's licensing scheme does not prohibit psychoanalysis, but merely regulates who can engage in it for a fee.
 
 
 [10]
 Plaintiffs concede that, if the licensing scheme is otherwise valid, they have no viable commercial speech claim for the right to use professional titles, such as "psychoanalyst" and "analytical psychologist."